Argued and submitted April 21, 2000, affirmed February 7, 2001

Jesse VANDEVENDER, Sr.,
and Nannie R. Vandevender,
*Appellants,*

*v.*

Richard B. THIEROLF, Jr.,
*Respondent.*

(95-4229-L-2; CA A104903)

18 P3d 473

George W. Kelly argued the cause and filed the briefs for appellants.

Robert L. Cowling argued the cause for respondent. With him on the brief were Benjamin M. Bloom and Hornecker, Cowling, Hassen & Heysell.

Before Edmonds, Presiding Judge, and Armstrong and Kistler,* Judges.

KISTLER, J.

---

* Kistler, J., *vice* Deits, C. J.

## KISTLER, J.

Plaintiffs brought this legal malpractice action against defendant, an attorney who had represented them in a livestock dispute. The trial court entered a directed verdict in defendant's favor. We affirm.

■ Because this case arises on defendant's motion for directed verdict, we set out the evidence in the light most favorable to plaintiffs. *Metropolitan Property & Casualty v. Harper*, 168 Or App 358, 367, 7 P3d 541 (2000). Plaintiffs raised cattle in Jackson County. In December 1992, plaintiffs took out a loan from the United States National Bank so that they could increase their herd. To get the loan, plaintiffs granted the bank a security interest in their "farm products, livestock, equipment, accounts, contract rights, chattel paper, general intangibles and inventory[.]"[1] In 1994, plaintiffs needed additional money and restructured their loan with the bank. On October 24, 1994, the bank gave them a $140,000 short-term loan that came due on May 5, 1995. In addition to the property used to secure the first loan, plaintiffs gave the bank a deed of trust conveying their interest in certain real property (the Stewart Avenue property).

In the early 1990s, plaintiffs had hired P. J. Burgess to help with their cattle business. While he was working for plaintiffs, Burgess borrowed approximately $30,000 from them. In 1993, Burgess left plaintiffs' employment in Jackson County to start his own cattle operation in Prineville. Burgess suggested that he take plaintiffs' cattle to Prineville and work out what he owed them by taking care of their cattle. Plaintiffs understood that Burgess would credit what he owed them against any obligations they incurred as a result of Burgess's care of their cattle.

Problems arose after Burgess took plaintiffs' cattle to Prineville. According to plaintiffs, Burgess sold part of

---

[1] A financing statement filed in September 1992 lists the United States National Bank as the secured party and J. L. and Nannie R. Vandevender, dba Van Duyns Candies & Gifts, as the debtors. The financing statement lists as collateral "[a]ll accounts, contract rights, chattel paper, documents, instruments, and general intangibles, and all inventory now owned and hereafter acquired and all products and proceeds thereof."

plaintiffs' herd and kept the proceeds. Plaintiffs asked for an accounting, but Burgess ignored them. In November 1994, Burgess sent plaintiffs a bill for approximately $35,000 for taking care of the cattle. Plaintiffs disputed Burgess's bill. Not only did they believe that he had charged them too much, but they concluded that he had not given them a credit on their bill for everything he owed them. Plaintiffs did not pay the bill, and Burgess filed a notice of intent to foreclose. The notice stated that on January 2, 1995, plaintiffs' cattle would be sold at a foreclosure sale to satisfy Burgess's agricultural services lien in the amount of $35,417.85 plus interest and to recover the cost of caring for the cattle until the date of the foreclosure sale.[2]

Approximately one month before the scheduled foreclosure sale, plaintiffs' son met with defendant. He asked defendant if plaintiffs could get an injunction to stop the sale. According to plaintiffs' son, defendant said "no." Plaintiffs then tried to settle their dispute with Burgess. After consulting with plaintiffs, defendant sent Burgess's lawyer a letter stating that plaintiffs would pay Burgess $9,000 to settle the matter. Later, plaintiffs offered to pay Burgess $25,000 to settle. Burgess did not accept either offer. In December 1994, the bank told plaintiffs that Burgess's lien violated plaintiffs' loan agreement with the bank. The bank demanded that plaintiffs either post the amount of Burgess's lien or a bond to protect the bank in the event that the cattle were sold.

Relying on defendant's advice, plaintiffs filed a petition for bankruptcy under Chapter 13 of the bankruptcy code. *See* 11 USC § 1301 *et seq*. After the bankruptcy petition was filed, the case was referred to mediation. Mediation proved unsuccessful, but afterwards plaintiffs, the bank, and Burgess engaged in several weeks of settlement discussions. Defendant recommended that plaintiffs enter into a proposed settlement with the bank and Burgess.[3] The proposed settlement required plaintiffs to surrender their cattle to the bank

---

[2] Under ORS 87.226(1), a person who performs labor, supplies materials, or provides services on farmland, range, ranch, orchard or in that person's place of business to aid the raising of animals has a lien on the animals for the reasonable or agreed charges for labor, materials, or services. The lien attaches to the proceeds of the animals on the date a notice of claim of lien is filed. ORS 87.226(1).

[3] Defendant explained that he recommended that plaintiffs accept the settlement because it eliminated any uncertainty, reduced their debt to the bank,

along with a pickup truck and a trailer. The bank would sell Burgess the cattle for $50,000 and reduce plaintiffs' debt to the bank to $55,000. The bank agreed to release its security interest in all of plaintiffs' property except for its interest in the Stewart Avenue property. Finally, Burgess would forgive plaintiffs' debt to him, and they would dismiss their bankruptcy petition.

Plaintiffs signed the settlement agreement, which defendant told them was only a preliminary agreement. Later, plaintiffs told defendant that they had received an offer to buy their candy store for $100,000 and wanted to get out of the settlement. Defendant said that he could not help them do that and that, if they wanted to get out of the settlement, he could not continue to represent them. Plaintiffs then brought this action alleging that defendant had been negligent in representing them and that they had been damaged as a result. Plaintiffs' seventh amended complaint contains 11 specifications of negligence. Among other things, plaintiffs alleged that defendant had been negligent "[i]n filing a [C]hapter 13 bankruptcy rather than an action directly attacking Burgess['s] claimed 'feed lien' " in state court.

At the close of plaintiffs' case, defendant moved for a directed verdict because plaintiffs had failed to prove damages. Defendant argued that plaintiffs had failed to prove that they would have achieved a better outcome if defendant had not been negligent. After hearing defendant's argument, the trial court asked plaintiffs, "What is the evidence of what the outcome would have been that's in the record?" Plaintiffs responded by focusing on a single specification of negligence—whether defendant erred in recommending that they file a bankruptcy petition instead of "directly attacking Burgess['s] claimed 'feed lien' " in state court. They explained that their expert, Owen McCullen, had "said that, had they not filed the [Chapter] 13, they should have been able to hold on to the herd; that's what this case is about."

extended the amount of time plaintiffs had to pay back the bank, avoided additional costly litigation, and released the bank's security interest on the property they had used as collateral for the loan except for the Stewart Avenue property.

Defendant acknowledged that McCullen made that statement on direct examination but argued that he withdrew it on cross-examination. According to defendant, McCullen had testified on cross-examination that he could not say that plaintiffs would not have lost their herd if they had sought to enjoin the foreclosure sale in state court. Plaintiffs replied that McCullen's testimony on cross-examination was susceptible to two interpretations, and the trial court denied defendant's motion.

After all the evidence had been submitted, defendant renewed his motion for a directed verdict.[4] He argued that there was no evidence that the outcome would have been different if he had not been negligent. The following colloquy occurred:

"THE COURT: Didn't [plaintiffs' expert] testify that they should have been able to hold on to the herd?

"[DEFENDANT'S ATTORNEY]: He said that on direct examination, and I believe he withdrew it on cross-examination.

"* * * * *

"[PLAINTIFF'S ATTORNEY]: I think he did address it himself; he said that they would have held on to the herd had they gone to state court, which is what they should have done.

"THE COURT: And if we had to say, 'Tell me what it is they would have gotten, the plaintiffs would have gotten, had there not been negligence or malpractice in this case,' you would say that what they would have gotten is they would have held on to the herd?

"[PLAINTIFF'S ATTORNEY]: Yes, and got the value of the herd. That's what the case is about; that's what it's always been about."

---

[1] Before he moved for a directed verdict for lack of damages, defendant moved for a directed verdict on the ground that plaintiffs' voluntary decision to enter into the settlement precluded them from bringing this action. Plaintiffs responded that their decision to settle resulted from defendant's negligent advice to file for bankruptcy. Plaintiffs argued: "[F]iling a Chapter 13 was beneath the standard of care. Everything else flows from that negligence. In other words, the settlement and so on does not relieve [defendant] of liability because the settlement was also entered into on his advice and after they were put in this position."

Plaintiffs' malpractice claim, as their attorney twice explained it to the court, turned on their expert's testimony that plaintiffs would have been better off if they had gone to state court and opposed the foreclosure sale instead of filing for bankruptcy. Plaintiffs identified no other evidence or theory in response to the trial court's questions. Because the expert's testimony had been transcribed by that time, the court reviewed the transcript before ruling on defendant's motion. The next day, the court announced on the record that it had told the parties that it was granting defendant's motion for a directed verdict. The court added:

> "I will indicate that I have advised [plaintiffs' counsel] that, if he made a motion pursuant to Rule 63B, that I would submit the case to the jury. He has consulted with his clients and has decided not to make the motion to submit the case to the jury, and so we will not."

On appeal, plaintiffs argue that the court erred in directing a verdict because there was evidence in the record from which the jury could have found that defendant's negligence damaged them. They also argue that the court erred in excluding evidence that would have advanced their case. Defendant responds that we need not consider plaintiffs' arguments because plaintiffs gave up any right to challenge the court's rulings when they declined its invitation to submit their case to the jury. Alternatively, defendant argues that the trial court's directed verdict and evidentiary rulings were correct. Because we agree with defendant that the rulings were correct, we need not decide whether plaintiffs' decision not to submit the case to the jury waived any objection that plaintiffs might have to the court's rulings.

■ We begin with the trial court's ruling granting defendant's motion for a directed verdict. In order to prove a claim for legal malpractice, plaintiffs had to establish that "defendant's representation fell below the standard of care and that, had [d]efendant met the standard of care, the result would have been different[.]" *Butler v. Vanagas*, 135 Or App 1, 5, 897 P2d 1176 (1995). On the first point, plaintiffs' expert McCullen testified that defendant's recommendation to file a Chapter 13 bankruptcy petition fell below the standard of care. He explained that the proposed "plan was not feasible,

not confirmable, and for that reason I think [it was] inappropriate to file a [Chapter 13] case." McCullen also testified that it would have been appropriate for defendant to file an action in state court both to enjoin Burgess from foreclosing his lien and to litigate its validity.

Under *Butler*, plaintiffs also had to show that the result would have been different if defendant had recommended that they file an action in state court rather than a Chapter 13 petition in federal court. An action may not succeed or may be only partially successful regardless of the forum in which it is filed. Plaintiffs accordingly had to introduce evidence from which a reasonable juror could find that, as a result of filing in federal court, plaintiffs achieved a worse result than they would have achieved if they had filed in state court. Plaintiffs did not meet that burden. McCullen acknowledged that the petition for bankruptcy automatically stayed the foreclosure sale of plaintiffs' cattle, *see* 11 USC § 1301(a), and that it also provided plaintiffs with a forum for determining the validity of Burgess's lien claim. It may be that plaintiffs had a valid defense to Burgess's lien claim, but they could have litigated that claim in either state or federal court.

Plaintiffs' expert, however, provided two potential bases for saying that plaintiffs realized a less favorable result by filing a bankruptcy petition in federal court. He noted that the trustee was not likely to approve plaintiffs' plan to pay back their debt. Plaintiffs, Burgess, and the bank, however, settled their claims against each other before the trustee decided whether to approve the plan. Plaintiffs do not argue, nor are we aware of any evidence, that the prospect that the trustee might not approve the plan resulted in a different settlement than the parties would have reached if plaintiffs had started in state rather than federal court.[5]

Plaintiffs' expert also testified on direct examination that defendant's failure to meet the standard of care resulted in losses. He testified:

---

[5] Indeed, the evidence was undisputed that plaintiffs were free to dismiss their Chapter 13 petition at any time they wished.

"A. [Y]ou, in effect, are having a significant loss. First of all, there's an expense factor, $18,000 claim in attorney fees. And to my understanding, the plaintiffs are no better off than they were at the beginning of the case. So there's a real question about the value of the services rendered in the first instance.

"In the second instance, a cattle herd apparently is gone. And, to my knowledge, there never was an accurate determination in the first place whether there was a valid lien or, if there was a valid lien, the amount of that lien.

"And finally, it looks to me, from looking at U.S. Bank's documents, they received $50,000 from the Burgesses, and the Burgesses got the herd, and we have no idea what the value of that herd might have been. I doubt sincerely that the Burgesses went out and paid top dollar for those cattle.

"Q. Would the value of the herd represent the loss as a result of this failure to meet the standard of care? In other words, the difference between the value of the herd and where they are now, would that represent the damage?

"A. The value of the herd would definitely be — that's gone — so that would definitely be an item of damage; and any fees they paid are also, I believe, an item of damage."

That testimony identifies the damages that plaintiffs sustained after they filed in federal court and agreed to settle their claims. It does not identify the damages that plaintiffs suffered as a result of the decision to file in federal rather than state court.

McCullen's testimony on cross-examination makes that distinction clear. The following colloquy occurred on cross-examination:

"Q. And your further opinion is that, because of doing that [filing in federal court], the Vandevenders were harmed because they lost the herd and incurred fees?

"A. Yes, that's a summary of it, yes, yes.

"Q. And that necessarily assumes, doesn't it, [that] by taking another course of action, they would not have incurred fees or lost the herd?

"A. We don't know what might have happened. We know what did happen.

"Q. My question, Mr. McCullen, is whether or not it is your opinion that they would not have lost the herd and incurred fees had something else been done? Is that what you're telling the jury your opinion is?

"A. No.

"Q. I didn't think so. Thank you.

"A. I can only speculate without knowing."

The record demonstrates that McCullen's testimony on direct and cross-examination addressed two different issues. McCullen explained on direct that plaintiffs suffered losses after they filed in federal court. He did not address whether they would have suffered fewer losses if they had begun in state rather than federal court. Rather, as he clarified on cross-examination, he could offer no opinion on that issue, which was the necessary predicate for plaintiffs' malpractice claim. Accordingly, this is not a case in which a witness makes inconsistent statements, leaving the jury free to believe either statement. *See Hunter v. Farmers Ins. Co.*, 135 Or App 125, 135, 898 P2d 201 (1995). Rather, this is a case in which cross-examination made clear that the opinion McCullen offered on direct examination provided no basis for saying that plaintiffs suffered more damages because defendant recommended that they file in federal rather than state court.

On appeal, plaintiffs advance three additional reasons why the trial court erred. First, they argue that there was evidence in the record from which the jury could have found that Burgess's lien claim was invalid. That issue, however, could have been raised in federal as well as state court. Moreover, plaintiffs never explain how the decision to begin in federal court affected their resolution of their rights in the settlement. Second, plaintiffs argue that there was evidence that defendant should have known that plaintiffs' reorganization plan would not be approved by the bankruptcy judge. As explained above, however, plaintiffs settled before the bankruptcy judge was asked to approve the plan. Plaintiffs do not identify any evidence that the result plaintiffs achieved would have been better if they had started in state court.

■　　Finally, plaintiffs argue that the jury could have found that the cattle were worth more than they received for them in the settlement. They appear to argue that defendant negligently recommended that they accept the proposed settlement because the jury could have found that they would have achieved a better result if they had not settled.[6] There is evidence in this record that would permit the jury to find that plaintiffs received less as a result of the settlement than they would have achieved if they had litigated Burgess's lien claims in either state or federal court and prevailed.

The difficulty, however, with plaintiffs' last argument on appeal is that they did not raise that theory of negligence in response to defendant's motion for a directed verdict. When the trial court asked plaintiffs to identify the basis for saying that the outcome would have been better if defendant had not been negligent, plaintiffs did not identify the evidence they now cite on appeal, nor did they argue that defendant's negligence lay in recommending the settlement. Rather, plaintiffs told the trial court that they were damaged by defendant's recommendation to file for bankruptcy when he should have recommended that they oppose Burgess's lien claims in state court. Plaintiffs' new ground for avoiding defendant's directed verdict motion comes too late. *See Safeco Ins. Co. v. Laskey*, 162 Or App 1, 11-12, 985 P2d 878 (1999).

■　　Plaintiffs also assign error to the trial court's ruling excluding their expert's testimony that Burgess's lien claim was not cognizable. On redirect, plaintiffs' attorney asked McCullen whether he had been able to "form an opinion and, more probably than not, what the result might have been had they litigated [Burgess's lien claim] in state court[.]" Defendant objected on the grounds that the question went beyond the scope of his cross-examination, called for speculation, was not a proper subject of opinion testimony, and that there was a lack of foundation. The trial court sustained defendant's objection. In plaintiffs' offer of proof, McCullen testified:

"I did not see anything in the documents that I reviewed or in the depositions that convinced me that [Burgess] had

---

[6] We note that the same argument could be made about almost any settlement. In almost every case, the parties to a settlement get less than they would receive if they prevailed at trial.

a cognizable lien claim. I saw the possibility if there was a cognizable lien claim of a very real defense—of several defenses—one set off in that there was testimony back and forth as to who—as to loans made to * * * Burgess and the lack of an accounting.

"I saw a series of letters from the plaintiffs' son to Mr. Burgess requesting an accounting. And I saw correspondence from the plaintiffs' son to Mr. Burgess complaining that there was no response and no accounting provided.

"Now, in my experience, when you ask for an accounting and you don't get one, there's a reason for that: They either don't want to show you the accounting or they can't show you the accounting."

Plaintiffs argue that McCullen's testimony should have been admitted because it "went directly to a central issue in the case: Whether an attack on the Burgess lien would have done plaintiffs any good."

Even if the court erred in sustaining defendant's objection, plaintiffs' offer of proof makes clear that the error did not prejudice plaintiffs. *See State v. Thomas*, 167 Or App 80, 84, 1 P3d 1058 (2000) (evidentiary error is harmless if there is little likelihood that the error affected the verdict). McCullen's testimony would have added nothing to plaintiffs' claim that defendant erred in recommending that they pursue their claim in federal rather than state court. If plaintiffs had a valid defense to Burgess's lien claim, as McCullen's testimony implies, plaintiffs could have asserted that defense equally in state or federal court. The excluded testimony does not advance plaintiffs' claim that they were damaged because their attorney filed for bankruptcy in federal court instead of opposing the lien in state court.[7]

Affirmed.

---

[7] Two points should be noted. First, the excluded evidence was relevant to a claim that plaintiffs were damaged by defendant's recommendation to accept the settlement. As explained above, however, plaintiffs did not rely on that theory as a basis for opposing defendant's motion for directed verdict. Second, plaintiffs' decision not to rely on that theory to oppose the directed verdict motion was not dictated by the court's evidentiary ruling. Plaintiffs correctly note in their opening brief that the evidence that was already in the record would permit a reasonable juror to find that plaintiffs received less than they were entitled to as a result of entering the settlement.